IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

CHARLES A. SHADID, L.L.C. an    *
Oklahoma Limited Liability Company,    *
       Plaintiff    *
       *
VERSUS    *     CASE NO.: 5:15-cv-595-D
       *
ASPEN SPECIALTY INSURANCE    *
COMPANY, a Foreign Corporation    *
       *
       *

* * * * * * * * * * * * * * * * * * * *

## DEFENDANT, ASPEN SPECIALTY INSURANCE COMPANY'S, MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

**LOBMAN, CARNAHAN, BATT, ANGELLE & NADER**

**BY:** *s/ James P. Nader*
**JAMES P. NADER, OBA #32156**
400 Poydras St., Suite 2300
New Orleans, LA 70130
Telephone: (504) 586-9292
Facsimile: (504) 586-1290
jpn@lcba-law.com

**and**

**ANDREA R. RUST, OBA #30422**
  **MILLER DOLLARHIDE**
210 Park Avenue, Suite 2550
Oklahoma City, OK 73102
Telephone: (405) 236-8541
Facsimile: (405) 235-8130
arust@millerdollarhide.com

*Attorneys for Aspen Specialty Insurance Company*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES..................................................................... ii

INTRODUCTION ................................................................................. 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 4

ARGUMENTS AND AUTHORITY ......................................................... 14

      I.     Summary Judgment Standard................................................... 14

      II.    Aspen is Entitled to Summary Judgment on All of Plaintiff's
             Claims Due to Plaintiff's Failure to Satisfy Its Contractual Obligation
             to Cooperate in the Investigation of the Claim........................................ 15

      III.   Failing Summary Judgment of All of Plaintiff's Claims, Aspen
             Is Entitled to Dismissal of Plaintiff's Bad Faith Claims ......................... 22

      IV.  Aspen is Entitled to a Judgment as a Matter of Law that Plaintiff
             May Not Recover for Property Damage that Existed Prior to
             the Effective Period of the Aspen Policy ................................................. 25

      V.    Aspen is Entitled to a Judgment as a Matter of Law that Plaintiff
             May Not Recover on a Replacement Cost Basis for Damages to
             Properties Sold by Shadid Prior to the Completion of Repairs
             Related to the May 31, 2013 Weather Event............................................ 26

CONCLUSION .................................................................................. 27

CERTIFICATE OF SERVICE............................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Econ. Ins. Co. v. Bogdahn*, 2004 OK 9, 89 P.3d 1051 ........................................ 15

*Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co.*,
720 F.3d 798 (10th Cir. 2013) ................................................................... 22

*Ball v. Wilshire Ins. Co.*, 2009 OK 38, 221 P.3d 717 ............................................. 23

*Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162 (Okla. 2000) .................... 23

*Bituminous Cas. Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030 (Okla. 2002) .............. 15

*Buzzard v. Farmers Ins. Co.*, 1991 OK 127, 824 P.2d 1105 ..................................... 23

*Bryant v. Sagamore Ins. Co.*, 18 F. Supp.3d 1245 (E.D. Okla. 2014)
aff'd, 597 F. App'x 968 (10th Cir. 2015) .................................................... 16

*Bryant v. Sagamare Ins. Co.*, 597 F. App'x 968 (10th Cir. 2015) ....................... 15, 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 14

*First Bank of Turley v. Fid. Deposit Ins. Co. of Maryland*,
1996 OK 105, 928 P.2d 298 .......................................................... 16, 22, 24

*Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315 (10th Cir. 2009) .............................. 15, 25

*McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583 ................................. 23

*Mount Highlands, LLC v. Hendricks*, 616 F.3d 1167 (10th Cir. 2010) .................... 14

*Neustrom v. Union Pacific R.R. Co.*, 156 F.3d 1057 (10th Cir. 1998) ..................... 14

*Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431 (10th Cir. 1993) ........................ 24

*Roberts v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 587 (10th Cir. 2003) .......... 23

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................................... 14

*Truesdell v. State Farm Fire & Cas. Co.*, 960 F. Supp. 1511 (N.D. Okla. 1997) ...... 26

*Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*,
114 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991) ....................................16, 22

**STATUTES**

Fed. R. Civ. P. 56.......................................................................................................... 14

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

CHARLES A. SHADID, L.L.C. an    *
Oklahoma Limited Liability Company,   *
       Plaintiff                *
                                      *
VERSUS                        *       CASE NO.: 5:15-cv-595-D
                                      *
ASPEN SPECIALTY INSURANCE     *
COMPANY, a Foreign Corporation    *
                                      *
                                      *

* * * * * * * * * * * * * * * * * * * *

## DEFENDANT, ASPEN SPECIALTY INSURANCE COMPANY'S, MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant, Aspen Specialty Insurance Company ("Defendant" or "Aspen"), pursuant to Fed. R. Civ. P. 56, seeks summary judgment dismissing all of Plaintiff's claims, including Plaintiff's claims for bad faith and punitive damages, asserted in this matter on the basis that Plaintiff repeatedly failed to cooperate with Aspen in its claim investigation, which prevented Aspen from completing a full and adequate adjustment of Shadid's claim. Plaintiff's cooperation was particularly necessary in this claim as it involves an alleged hail damage claim to over 20 different commercial properties all of which exhibited evidence of pre-existing damage for which Aspen is not liable. Additionally, Aspen seeks judgment as a matter of law that 1) Plaintiff may not recover for property damage that existed prior to the effective period of the Aspen policy, and 2) that Plaintiff may not recover the replacement value of damage allegedly sustained to buildings which were sold by Plaintiff prior to repairs being completed such that he may only collect the "actual cash value" of any damages, if any are determined by the jury, in accordance with the terms of the Aspen

1

policy.

## INTRODUCTION

Plaintiff, Charles A. Shadid, L.L.C. ("Shadid"), filed suit against Aspen seeking to recover for damages allegedly sustained to 20 properties insured by Aspen on or about May 31, 2013. Shadid generally alleges Aspen breached its obligation to conduct a reasonable investigation of the claim and failed to pay what was owed to Shadid under the policy. Shadid also claims Aspen violated its duty of good faith to its insured.

However, the law and undisputed facts do not support these contentions. Aspen fulfilled its obligation to investigate Shadid's claim in good faith and is entitled to summary judgment because Shadid breached the insurance contract by failing to cooperate in the investigation of the claim, and Shadid has not established a covered loss under the Aspen policy. Despite its extensive efforts, Aspen was unable to determine whether a covered loss occurred due to Shadid's failure to cooperate in the investigation in providing Aspen with critical information as to the condition of the properties prior to May 31, 2013 and information regarding at least two prior insurance claims for the same or overlapping damages in 2010 and 2012. The Aspen policy contractually obligated Shadid to cooperate with Aspen in the investigation of the claim, including allowing Aspen to examine Shadid's "books and records." However, Shadid refused Aspen access to records and information which were essential to Aspen's investigation.

Shadid submitted a First Notice of Loss 2½ months after the May 31, 2013 weather event, initially claiming only one property had been damaged (Lakeshore Shopping

2

Center).  However, Shadid then expanded its claim to include a total of 23 properties. Shortly after receiving notice of the claim, Aspen conducted an initial inspection of the Shadid buildings which revealed extensive pre-existing damage.  Although prior claims, repairs, and maintenance are typically relevant to a claim involving buildings of significant age, such as these, the presence of pre-existing damages in this claim made this information particularly vital to Aspen's evaluation of the loss.  Aspen also became aware of multiple prior claims for hail damage to the same buildings, including an open lawsuit seeking damages from one of Shadid's prior insurers for hail damage in May 2010.  Aspen's investigation suggested these buildings had only been partially repaired after hail events occurring in May 2010 and May 2012.

Aspen actively and in good faith investigated Shadid's claims over the course of seventeen months, repeatedly requesting information regarding Shadid's prior claims and repairs in order to accurately ascertain the damages which may have been caused by the May 31, 2013, storm.  After Shadid repeatedly refused to provide this information over this seventeen-month period, Aspen was forced to deny Shadid's claim as Shadid's lack of cooperation made it impossible to determine the existence or extent of a covered loss.  As Aspen was justified in denying the claim for Shadid's failure to comply with its post-loss obligation of cooperation under the Aspen policy, Aspen is entitled to summary judgment of the entirety of Shadid's claims.  In the alternative, and at a minimum, Aspen is entitled to summary judgment on Plaintiff's bad faith and punitive damage claim.

Shadid is also seeking the full replacement value of the entire roofs of at least 35 buildings at the 20 properties involved in this lawsuit.  As established through Aspen's

3

extensive investigation of this claim (despite the lack of cooperation from Shadid), and as acknowledged by Shadid itself, much of the damage to the roofs of these properties were sustained in May of 2010, May of 2012, and likely through other hail storms.  Further, Aspen's investigation established, and Shadid has admitted, that not all of these roofs were fully repaired after these earlier storms.  The Aspen policy issued to Shadid was in effect from August 20, 2012 to August 20, 2013.  As such, under the clear terms of the policy, Aspen provided no coverage for damages sustained in the 2010 or 2012 weather events, or otherwise prior to these effective dates.  Aspen is entitled to a judgment as a matter of law that it is not liable for any damage to the Shadid properties which, as may ultimately be determined at trial, to have occurred outside of the Aspen policy period.

Further, Shadid has acknowledged that two of the properties involved in this lawsuit were sold without permanent repairs or replacement of damage allegedly sustained in the May 30, 2013 storm having been completed.  The Aspen policy unambiguously allows for payment on a replacement cost basis only when lost or damaged property is actually repaired or replaced.  As such, Aspen is entitled to a judgment as a matter of law that it is not liable for the replacement cost value of damages found at trial to have been sustained to the buildings which were sold by Shadid and for which Shadid never completed repairs.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Aspen Policy Number PRAAJM212 was issued to Charles A. Shadid, Charles A. Shadid, LLC, and Charles A. Shadid Revocable Trust, providing coverage to 25 properties in the Oklahoma City area. (Exh. 1, Anniello Affidavit, ¶3; Exh. 2, Aspen

Policy PRAAJM212).

2.  Shadid provided a First Notice of Loss to Aspen on or about August 16, 2013, alleging one of the covered properties (Lakeshore Shopping Center), was damaged approximately two and a half months earlier by a weather event on May 31, 2013. (Exh. 1, Anniello Affidavit, ¶4; Exh. 3, 8/15/13 Property Loss Notice of Loss).

3.  Aspen assigned the field adjustment of the claim to Associated Claims Management ("ACM") the next day. (Exh. 1, Anniello Affidavit, ¶5; Exh. 4, Acknowledgement of Assignment).

4.  On or about August 26, 2013, Shadid's insurance agent notified ACM that Shadid wanted to expand the scope of the claim to include multiple additional properties. (Exh. 1, Anniello Affidavit, ¶6; Exh. 5, 8/26/13 ACM Time Log Entry).

5.  On or about August 27, 2013, ACM contacted Shadid to notify Shadid that ACM would be scheduling inspections and requesting information about Shadid's prior claims, repairs, and maintenance history for the involved properties. (Exh. 1, Anniello Affidavit, ¶7; Exh. 6, Ken Smith emails to Jonna Holm).

6.  On or about August 30, 2013, ACM was notified Shadid hired Jerry Renfroe as a Public Adjuster (P.A.) to handle the Shadid claims, and ACM and Renfroe discussed coordinating the property inspections. (Exh. 1, Anniello Affidavit, ¶8; Exh 7, ACM 8/30/13 Time Log Entry).

7.  On or about September 5, 2013, ACM sent a letter to Shadid and Renfroe requesting information and documentation, including: 1) specific repairs made due to the alleged May 31, 2013 loss along with corresponding estimates; 2) approximate dates

5

of the acquisition of the properties; 3) major exterior repairs during the previous ten years; 4) the identification of documents associated with prior claims for damage; and 5) a list of all insurance policies that had provided coverage in the previous ten years.  The letter also referenced the applicable policy provisions regarding Shadid's duties of cooperation in the event of a loss. (Exh. 1, Anniello Affidavit, ¶9; Exh. 8, 9/4/13 ACM Letter to Shadid).

8. On or about September 5, 2013, ACM and Renfroe agreed to dates for the property inspections. (Exh. 1, Anniello Affidavit, ¶10; Exh. 9, ACM 9/5/13 Time Log Entry).

9. On or about September 19, 2013, ACM again requested that Renfroe cooperate and provide documents regarding prior building repairs and insurance claims for the Shadid properties. (Exh. 1, Anniello Affidavit, ¶11; Exh. 10, ACM 9/19/13 Time Log Entry).

10. ACM inspected the Shadid properties from September 23 through September 26, 2013.  During these inspections, ACM observed hail damage that appeared to be old and to preexist the alleged date of the claim. (Exh. 1, Anniello Affidavit, ¶ 12; Exh. 11, Aspen 10/3/13 Log Entry).

11. Shadid told ACM that he was an attorney and had not settled any insurance claims in the past without filing a lawsuit. (Exh. 1, Anniello Affidavit, ¶13; Exh. 11, Aspen 10/3/13 Log Entry).

12. ACM subsequently located a lawsuit filed by Shadid for May 2010 hailstorms in which Shadid claimed over $5,000,000.00 in damages to many of the same properties involved in the claim against Aspen.  (Exh. 1, Anniello Affidavit, ¶13;

6

Exh. 11, Aspen 10/3/13 Log Entry; Exh. 35, Petition, Case No. CJ-2013-1210, District Court of Oklahoma County, State of Oklahoma).

13. The inspections also showed that some of the roofs had been only partially replaced prior to the inspection, that some roofs currently on the buildings appeared to pre-date the 2010 hailstorm, and that hail impacts to rooftop components and equipment were old damage. (Exh. 1, Anniello Affidavit, ¶15; Exh. 13, 11/13/13 ACM Loss Status Report).

14. ACM independently researched historical weather data in the area of the insured properties which revealed over 50 storms in the previous 10 years with hail of one inch or larger. (Exh. 1, Anniello Affidavit, ¶16; Exh. 13, 11/13/13 ACM Loss Status Report; Exh. 36, ACM 10-Year Hail Research, Exh. 37, ACM Hail Events at Properties Owned by Charles Shadid).

15. Shadid responded to ACM's September 4, 2013, request for information and documents four months after the date of the storm by letter received by ACM on or about October 7, 2013.  However, Shadid provided only very limited information regarding: 1) repairs associated the alleged May 31, 2013 loss and 2) the dates on which the properties were acquired by Charles A. Shadid, LLC.  Shadid did not provide: 1) estimates for repairs related to the alleged loss; 2) dates the properties were first acquired by Shadid *or any of his related entities who acquired the properties prior to their ownership being transferred to Charles A. Shadid, LLC;* 3) information regarding major exterior repairs from earlier years; 4) information regarding prior damage property claims; or 5) a list of prior insurance policies from

the previous ten years. (Exh. 1, Anniello Affidavit, ¶17; Exh. 14, ACM 10/7/13 Time Log Entry; Exh. 15, Shadid Letter dated 9/23/13).

16. On October 10, 2013, Shadid submitted a repair estimate to Aspen that did not appear to account for pre-existing damage or partial repairs, and included the full replacement of all roofs, rooftop components, HVAC units, and other structural components on all buildings included in the claim. (Exh. 1, Anniello Affidavit, ¶18; Exh. 16, 10/10/13 Shadid letter to Aspen; Exh. 17, Just Property Restoration Estimate.)

17. On or about November 4, 2013, ACM sent another informational request letter to Shadid 1) seeking more specific descriptions of the repair work which was allegedly completed due to the storm of May 31, 2013; 2) reiterating its prior requests for information about prior claims and repairs in the ten years prior to the loss; 3) notifying Shadid of potential coverage issues regarding wear/tear/decay of the property, prior inadequate repairs and maintenance, and the lack of coverage for water damage where no opening was created in the structure; 4) notifying Shadid the policy only provided coverage for damages during the policy period; 5) notifying Shadid that ACM's inspection had revealed damage that appeared to precede the policy period; 6) advising Shadid the requested information was necessary for the determination of a reasonable settlement value; and 7) requesting to speak with Mr. Shadid directly and conduct an Examination Under Oath. (Exh. 1, Anniello Affidavit, ¶¶19, 20, 21; Exh. 18, 11/4/13 ACM letter to Shadid).

18. On or about November 22, 2013, Aspen's counsel sent a letter to Shadid, again stating that only damage occurring during the policy period was covered under the Aspen policy, advising Shadid of Aspen's intent to have an engineer inspect the properties upon receipt of the requested documentation, reasserting Aspen's prior requests for documents and information, and requesting an Examination Under Oath of Mr. Shadid. (Exh. 1, Anniello Affidavit, ¶22; Exh. 19, 11/22/13 Aspen Letter to Shadid).

19. On or about December 8, 2013, Aspen's counsel sent a letter to Shadid confirming the scheduling of an Examination Under Oath to occur on January 16, 2014 and again restating the need for Shadid to provide the requested information regarding the condition of the properties prior to the date of loss. (Exh. 1, Anniello Affidavit, ¶23; Exh. 20[1], 12/8/13 Aspen Letter to Shadid).

20. Shadid responded to Aspen's counsel's letter on or about December 13, 2013, stating he intended to provide information to which he believed Aspen was entitled. However, Shadid did not provide the requested information regarding prior repairs to the properties or any information regarding prior damage claims. (Exh. 1, Anniello Affidavit, ¶24; Exh. 21, 12/13/13 Shadid Letter to Aspen).

21. The Examination Under Oath of Charles Shadid occurred on January 16, 2014. Shadid stated he had filed significant losses on the properties over the previous seven years, including at least one ongoing lawsuit associated with a 2010 hail

---

[1] Exhibit 20 is dated 6/12/14 due to an "auto-date" and this date reflects when the letter was printed from the electronic file rather than the date the letter was sent.

claim, in which he inaccurately indicated he was seeking damages of approximately $2,000.000.00. (Exh. 1, Anniello Affidavit, ¶25; Exh. 22, Shadid EUO, pp. 15-17, 106-107).

22. Aspen's counsel sent another letter to Shadid's counsel, Mark Engel, on or about February 7, 2014, now eight months after the storm in question, requesting documents which were discussed by Shadid at his EUO and which had been previously requested by ACM and Aspen's counsel on multiple occasions.  Again, these documents included: 1) repair estimates, invoices, and public adjuster reports regarding Shadid's 2010 claim against Covington Specialty Insurance Company; 2) documents Shadid produced in support of its claims in litigation regarding the 2010 loss; 3) photographs of the properties taken after the 2010 loss but prior to related repairs; 4) photographs taken after repairs related to the 2010 loss; and 5) documents regarding major exterior repairs undertaken in the 10 years prior to the May 31, 2013 loss. (Exh. 1, Anniello Affidavit, ¶26; Exh. 23, 2/7/14 Aspen Letter to Shadid).

23. After the EUO, Aspen learned that Shadid had made another claim related to hail damage in May 2012 for what Aspen believed included some or all of the same properties involved in the claim against Aspen. (Exh. 1, Anniello Affidavit, ¶27).

24. Shadid's counsel provided 522 pages of documents to Aspen on or about March 20, 2014.  These documents generally included information that had already been provided to Aspen as to repairs performed <u>after</u> May 31, 2013, <u>*and did not include any information regarding prior damage claims*</u>. (Exh. 1, Anniello Affidavit, ¶28; Exh. 24, 3/20/14 Shadid Letter to Aspen).

25. On or about April 11, 2014, ACM sent a letter to Shadid again asking for the previously requested documents and explicitly stating that Aspen "needs to know what was damaged, what was paid for, and what was actually repaired from the 2010 and 2012 storms." The letter requested that the documentation be provided prior to inspections by Aspen's engineers scheduled to begin on May 5, 2014. (Exh. 1, Anniello Affidavit, ¶29; Exh. 25, 4/11/14 ACM Letter to Shadid).

26. Shadid responded to Aspen's April 11, 2014 letter on or about April 21, 2014, referencing documents that he had previously provided showing post-storm repairs. However, Shadid continued to withhold documents and information regarding damages, repairs, or claims occurring before May 31, 2013. (Exh. 1, Anniello Affidavit, ¶30; Exh. 26, 4/21/14 Shadid Letter to Aspen).

27. In the April 21, 2014 letter, Shadid, for the first time (almost a full year from the storm), claimed the settlement agreement with Covington Insurance for his 2010 claim prevented Shadid from disclosing "documents and information" about the 2010 loss. (Exh. 1, Anniello Affidavit, ¶31, Exh. 26, 4/21/14 Shadid Letter to Aspen) Aspen believes the settlement agreement was not even confected at the time of its prior requests for documentation and information.

28. The settlement agreement cited by Shadid only prohibited the release of the amount of the settlement, not the underlying documents or information. (Exh. 1, Anniello Affidavit, ¶32, Exh. 28, 5/20/14 ACM Letter to Shadid).

29. Without the benefit of the information repeatedly requested by Aspen, Aspen's retained engineers inspected the Shadid properties between May 5, 2014 and May

14, 2014. (Exh. 1, Anniello Affidavit, ¶31; Exh. 27, ACM 5/5/14 – 5/14/14 Time Log Entries).

30. ACM responded to Shadid's letter of April 21, 2014 on or about May 20, 2014, again requesting documents regarding the roof repairs and documents regarding Shadid's 2010 and 2012 wind and hail claims.  Aspen also brought to Shadid's attention the fact that the documents requested by Aspen were not covered by Shadid's confidentiality agreement with Covington, which only applied to the amount of the settlement. Further, Aspen again notified Shadid that his refusal to provide this necessary information violated Shadid's post-loss obligations as contained within the Aspen policy to cooperate and assist Aspen in its investigation of the claim. (Exh. 1, Anniello Affidavit, ¶33; Exh. 28, 5/20/14 ACM Letter to Shadid).

31. ACM received a letter from Shadid on or about June 9, 2014, containing an additional 148 pages of documents.  These documents were largely duplicative of prior submissions received from Shadid evidencing repairs to the properties <u>after</u> May 31, 2013 and <u>*did not include documents regarding prior reparis and claims.*</u> (Exh. 1, Anniello Affidavit, ¶35; Exh. 29, ACM 6/9/14 Time Log Entry; Exh. 30, Shadid Letter to ACM dated 6/2/14).

32. ACM sent a letter to Shadid on June 30, 2014, now over one year from the storm in question, again restating its request for documentation regarding prior claims and repairs. <u>*ACM informed Shadid that Aspen had an incomplete picture of the loss due to his failure to provide cooperate in the investigation of the claim and that Aspen*</u>

_was unable to confirm whether any disputed damages were owed_. (Exh. 1, Anniello Affidavit, ¶36; Exh. 31, 6/30/14 ACM Letter to Shadid).

33. On July 8, 2014, Shadid's insurance agent provided Aspen with a list of roof repairs allegedly completed by Shadid.  However, the list only identified the dates on which the repairs were allegedly completed and did not include any documentation (e.g. invoices, photographs, payments) as to the reason for or extent of repair work actually performed. (Exh. 37, Anniello Affidavit, ¶37; Exh. 32, List of Roof Repair Dates from Shadid's Insurance Agent).

34. In the absence of information regarding prior damages, repairs or claims, Aspen's retained engineers independently compiled the limited information available to them on the properties such as aerial photographs of the roofs in a further effort to evaluate this claim.  The engineers were unable to relate any damage to the roofing membranes to the May 31, 2013 hailstorm based on this information.  However, they were able to determine, based on weather data, that the most significant prior hail event at the Shadid properties occurred on May 29, 2012, when hail of 1.5 to 2.4 inches may have fallen. (Exh. 1, Anniello Affidavit, ¶38; Exh. 33, 12/22/14 ACM Loss Status Report, Shadid v. Aspen 0172).

35. Aspen's policy was not in effect on May 29, 2012. (Exh. 2, Aspen Policy PRAAJM212, Shadid v. Aspen 1317).

36. Citing Mr. Shadid's continued refusal to cooperate and provide Aspen with documents and information related to this claim, Aspen denied the claim on or about February 18, 2015.  Shadid did not provide Aspen with the requested information

and documentation at any point prior to the claim denial and filing of this lawsuit.

(Exh. 1, Anniello Affidavit, ¶41; Exh. 34, 2/18/15 Aspen Letter to Shadid).

## ARGUMENTS AND AUTHORITY

### I.    Summary Judgment Standard

Summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted).

The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.  *Mount Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) (quotation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Neustrom v. Union Pacific R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (citation and quotation omitted).

**II.    Aspen is Entitled to Summary Judgment on all of Plaintiff's Claims Due to Plaintiff's Failure to Satisfy its Contractual Obligation to Cooperate in the Investigation of the Claim**

Aspen's policy outlines an insured's "Duties In The Event of Loss":

> a.  You must see that the following are done in the event of loss:
>     . . .
>> (3)  As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.
>>    . . .
>> (6)  As often as may be reasonably required, **permit us to . . . examine your books and records**.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and **permit us to make copies from your books and records**.
>>    . . .
>> (8)  **Cooperate with us in the investigation or settlement of the claim.**

(Exhibit 2, Aspen Policy PRAAJM212, Shadid v. Aspen 1343-44) (emphasis added).

Under Oklahoma law, insurance contracts are interpreted "in accordance with principles applicable to all contracts." *Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315, 1319 (10th Cir. 2009).  An insurance contract is "construed according to the plain meaning of its language," and, if unambiguous, the court "interprets the contract as a matter of law." Id. "Parties are at liberty to contract for insurance to cover such risks as they see fit and they are bound by the terms of the contract." *Am. Econ. Ins. Co. v. Bogdahn*, 2004 OK 9, ¶ 8, 89 P.3d 1051, 1054 (citation omitted).  When the policy language is clear and unambiguous, it is enforced so as to carry out the parties' intentions. *Bituminous Cas. Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030, 1033 (Okla.2002).

An insured has an obligation to cooperate with the insurer, which is both contractual and implied in law. *Bryant v. Sagamore Ins. Co.*, 597 F. App'x 968, 971 (10th Cir. 2015)

15

(citing *First Bank of Turley v. Fid. & Deposit Ins. Co. of Maryland*, 1996 OK 105, 928 P.2d 298, 304 (footnotes omitted)).  **It is the insured's duty to aid the insurer in the discovery of facts bearing on coverage.**  *First Bank of Turley,* 928 P.2d at 304 (emphasis added).

In *Bryant v. Sagamore Ins. Co.,* 18 F. Supp.3d 1245 (E.D. Okla. 2014) aff'd, 597 F. App'x 968 (10th Cir. 2015),  the plaintiffs filed suit against Sagamore for breach of contract and bad faith damages after Sagamore denied a claim under Bryant's auto policy.  After the insured reported the accident, Sagamore identified a coverage issue relative to an excluded driver provision.  Sagamore sought to communicate with the insured on multiple occasions, unsuccessfully, and attempted to obtain an examination under oath.  Eventually Sagamore denied coverage, in part, on the plaintiffs' failure to cooperate with its investigation. *Id.* at 1248 to 1249.  The District Court granted Sagamore's Motion for Summary Judgment based, in part, on the plaintiffs' failure to cooperate in the investigation of the claim. *Id.* at 1250.  On appeal, the plaintiffs argued that they had no duty to cooperate after Sagamore advised them there was no coverage for the excluded driver.  However, the 10th Circuit rejected this argument, stating, "an insured's duty to cooperate … continues for as long as the insured seeks to enforce its terms." *Bryant v. Sagamore Ins. Co.*, 597 F. App'x 968, 973 (10th Cir. 2015) (citing *Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322, 328 (1991)).  The court in *Waste Management* discussed the cooperation clause in insurance contracts:

> Typically the insurer has little or no knowledge of the facts surrounding a claimed loss, while the insured has exclusive knowledge of such facts.  **The insurer is, therefore, dependent on its insured for fair and complete**

16

**disclosure; hence, the duty to cooperate**.  While the insured has no obligation to assist the insurer in any effort to defeat recovery of a proper claim, **the cooperation clause does obligate the insured to disclose all of the facts within his knowledge and otherwise to aid the insurer in its determination of coverage under the policy.  The insurer is entitled . . . to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy** and in protecting against fraudulent claims.

144 Ill. 2d at 204, 579 N.E.2d at 333 (internal citations omitted) (emphasis added).

In the present case, despite being notified of the claim two and a half months after the alleged date of loss, being initially notified that the claim involved one property, and then later being notified that Shadid wished to expand the claim to include 22 additional properties, Aspen took immediate steps to investigate Shadid's claim in good faith.  The day after Shadid's agent notified Aspen of the potential scope of the claim, Aspen's field adjuster contacted Shadid to coordinate inspections of the properties and notified Shadid that Aspen would be seeking information regarding prior claims, repairs, and maintenance of the involved properties. (Exh. 5, 8/26/13 ACM Time Log Entry).  Aspen referenced its clear and unambiguous policy language regarding Shadid's duty to aid in the investigation of its alleged loss and specifically requested the information needed for that investigation. (Exh. 8, 9/14/13 ACM Letter to Shadid).

An important step in Aspen's investigation of the claim was to determine whether a covered loss had occurred on the May 31, 2013 alleged date of loss, during Aspen's policy period.  Once coverage could be established, the extent of any covered losses could then be identified by the appropriate investigator.  In order to evaluate coverage, especially after it discovered pre-existing damage at the initial inspection, Aspen required information

17

as to the condition of the properties before the alleged date of loss.  This information, in the form of documents to include records regarding prior claims, repairs, and maintenance, were in the custody or control of Shadid and could not be independently obtained by Aspen.[2]  However, as the record demonstrates, Shadid refused to provide this information from the very outset of the claim, instead demanding Aspen's $5,000,000 policy limit and pushing for a negotiated settlement without allowing Aspen an opportunity to conduct a full and complete investigation. (Exh. 12, 10/23/13 ACM email to Aspen).  The extensive efforts undertaken by Aspen to obtain the information necessary to properly investigate and pay Shadid's claim are set forth in great detail in the Affidavit of Anthony Anniello (Exh. 1) and in the Statement of Undisputed Facts, but will be summarized briefly here.

Over the course of the 18-month period between the notice of the alleged loss and the denial of the claim, Aspen made numerous requests for information regarding prior damages, repairs, and claims that would have assisted Aspen in accurately evaluating the existence and extent of a covered loss.   In addition to verbal or other informal communications, these requests included at least eight separate letters dated: September 5, 2013 (Exh. 8), November 4, 2013 (Exh. 18), November 22, 2013 (Exh. 19), December 8, 2013 (Exh. 20), February 7, 2014 (Exh. 23), April 11, 2014 (Exh. 25), May 20, 2014 (Exh. 28), and June 30, 2014 (Exh. 31).  Aspen repeatedly communicated to Shadid the reason why this information was necessary to Aspen's investigation and that it was Shadid's duty

---

[2] To the extent documents have subsequently been obtained in response to records subpoenas issued by Aspen in connection with this litigation, Aspen did not have the ability to issue such subpoenas during its claim investigation.

under the policy to provide this information.  However, at every turn, Shadid refused to cooperate in the investigation and "stonewalled" Aspen by withholding information within its control or custody.  The only documentation which was provided prior to Aspen's denial was related to the May 31, 2013 claim and repairs that were allegedly performed after May 31, 2013.  Shadid made multiple excuses for not providing this information, such as asserting that the information was irrelevant because the Aspen policy provided coverage for preexisting damage (which, as established below, it did not).  Shadid, an attorney, also asserted that the information was confidential pursuant to a prior settlement agreement. This agreement clearly only required confidentiality as to the amount of the settlement, not to any underlying information or documents regarding the damages to the properties.  This position was communicated to Shadid in writing.  At no point did Shadid dispute Aspen's interpretation of the agreement.  However, Shadid still refused to provide any information regarding the claim underlying the earlier lawsuit, the 2012 claim, or prior repairs and maintenance.

When Shadid did provide information, it only provided records regarding repairs made after the alleged date of loss and an estimate prepared by his public adjuster.  Shadid's failure to provide records regarding repairs to the properties was particularly egregious as the majority of repairs were done by Alamo Construction, a company under Shadid's control and which has been represented to exist solely for the purpose of working on Shadid's properties. Over 20,000 documents have been produced by Alamo, through Shadid's same counsel, in response to Aspen's subpoena at Aspen's expense.  Shadid frequently communicated his intention cooperate with Aspen's investigation and to comply

19

with Aspen's requests yet simultaneously refused to actually cooperate or provide the critical documents and information requested by Aspen.

Without any cooperation from Shadid, Aspen investigated Shadid's claim to the best of its ability. Despite not receiving information regarding prior repairs and claims after two early requests, Aspen continued with the initial inspection of the properties over the course of four days. (Exh. 11, Aspen 10/3/13 Log Entry). This inspection revealed damage that appeared to have occurred outside of Aspen's policy period. (Id.). This reinforced the need for information regarding the extent and source of prior damages, as well as any resulting repairs. However, instead of providing this information and despite clear evidence that there was significant pre-existing, non-covered damage to the properties, Shadid presented Aspen only with the information which would maximize its recovery – an estimate for the full replacement of all roofs, rooftop components, air conditioning units, and other structural components of all buildings included in the claim. (Exh. 17, Just Property Restoration Estimate). In contrast, Aspen wanted to review documents associated with the prior claims and repairs to determine whether Shadid, as it ultimately now appears, was seeking payment for property which had been damaged in a prior storm and which he had not made repairs.

After seven more months of unsuccessful attempts to obtain necessary information from Shadid to properly assess the claim, Aspen proceeded with inspections by its engineers between May 5, 2014 and May 14, 2014. (Exh. 27, ACM 5/5/14 – 5/14/14 Time Log Entries). Without the aid of information regarding the pre-claim condition of the roof, prior repairs, and prior claims, the engineers were unable to determine what, if any, damage

20

was caused by the May 31, 2013 weather event. (Exh. 38, ACM Summary of Engineering Reports). The engineers further identified damage that they believed could not have been caused by the May 31, 2013 weather event. (Id.). The investigation by Aspen's engineers further reinforced the need for the information Aspen had been requesting from Shadid at this point for nearly a year and raised new questions which could only be addressed with this information. After determining that it would not be able to accurately determine whether a covered loss occurred or the extent of any such loss without the requested information from Shadid, and after Shadid's continued refusal to cooperate in the investigation, Aspen was forced to deny the claim.

Contrary to Plaintiff's assertions, Aspen's denial of Plaintiff's claim was due to Plaintiff's own failure to comply with the clear terms of its contract with Aspen. Shadid did not permit Aspen to "examine [its] books or records" and repeatedly failed to "cooperate with [Aspen] in the investigation or settlement of the claim." An examination of Shadid's records would have allowed Aspen to determine the existence of a covered loss and the amount of such a loss, yet Shadid provided only documents designed to maximize Shadid's recovery regardless of the validity of its claim; and withheld those documents that would allow an accurate investigation and adjustment of Shadid's claim. Shadid hired a Public Adjuster to prepare an estimate for the complete replacement of the roofs, HVAC units, and other exterior components for every property included in the claim, yet asserted that the production of records regarding its prior repairs and claims (records that already existed and were under Shadid's custody and/or control) was somehow burdensome. It appears Shadid was concealing the documents in an effort to prevent Aspen from obtaining

21

information regarding the condition of the properties because it did not strengthen his claim for the $5,000,000 limits under the Aspen policy. Shadid, a shrewd attorney with extensive experience in making and litigating property insurance claims, for the many properties in his portfolio, knew exactly what he was doing.

Consistent with *Waste Management*, 144 Ill. 2d at 204, Shadid had exclusive knowledge of the facts regarding the condition of his properties prior to the alleged loss and Aspen was "entitled . . . to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy." Shadid did not fulfill his duty, as described in *First Bank of Turley*, 928 P.2d at 304, to "aid [Aspen] in the discovery of facts bearing on coverage." Aspen conducted an investigation that was thorough and went far beyond what would have been necessary had Shadid cooperated in the investigation. However, due to Shadid's lack of cooperation, Aspen was unable to determine if a covered loss existed, much less the extent of a covered loss in the event it did exist. As such, Aspen met its obligations under its insurance contract with Shadid and Shadid's claims must be dismissed.

III.    **Failing Summary Judgment on All of Plaintiff's Claims, Aspen is Entitled to Dismissal of Plaintiff's Bad Faith Claims**

The Court in *Automax Hyundai S., L.L.C. v. Zurich Am. Ins. Co.*, outlined the elements of a bad faith claim against an insurer under Oklahoma law. The insured must show:

1)  The insured was entitled to coverage under the policy;

2)  The insurer had no reasonable basis for delaying payment;

3)  The insurer did not deal fairly and in good faith with the insured; and

4)  The insurer's violation of the duty of good faith was the direct cause of the insured's injury.

720 F.3d 798, 810 (10th Cir. 2013) (citation omitted).  The burden is on the insured to establish each of these elements.  *Id.*

The tort of bad faith "does not prevent an insurer from denying, resisting or litigating any claim as to which the insurer has a legitimate defense." *Ball v. Wilshire Ins. Co.,* 2009 OK 38, 221 P.3d 717, 725.  "Resort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit." *Buzzard v. Farmers Ins. Co.,* 1991 OK 127, 824 P.2d 1105, 1109.  Oklahoma law recognizes that there may be disputes between an insurer and its insured regarding a variety of matters, including coverage, cause and amount of loss, or policy conditions. *McCorkle v. Great Atl. Ins. Co.,* 1981 OK 128, 637 P.2d 583, 587.

An insurer has a duty to "conduct an investigation that is reasonably appropriate under the circumstance. *Buzzard,* 824 P.2d at 1109.  However, this duty is not unlimited and is judged according to the circumstances. *Barnes v. Okla. Farm Bureau Mut. Ins. Co.,* 11 P.3d 162, 170-171 (Okla. 2000).  Under Oklahoma law, "an insurer's investigation need only be reasonable, not perfect." *Roberts v. State Farm Mut. Auto. Ins. Co.,* 61 F. App'x 587, 592 (10th Cir. 2003) (citing *Buzzard,* 824 P.2d at 1109).  In the context of bad faith, when an insured's "failure timely to provide critical information . . . not available from other sources makes it entirely impossible for the insurer to discharge its duty" relative to

an entire loss, the insurer is provided an "absolute defense against liability." *First Bank of Turley*, 928 P.2d at 308.

　*Oulds v. Principal Mut. Life Ins. Co.* addressed bad faith claims in the context of summary judgment:

> A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct. On a motion for summary judgment, the trial court must first determine, under the facts of the particular case and as a matter of law, whether insurer's conduct may reasonably be perceived as tortious. **Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed.**

6 F.3d 1431, 1436-37 (10th Cir. 1993) (citations omitted) (emphasis added).

　As described above, Aspen's investigation of this claim was far more than "reasonably appropriate" in the face of Shadid's lack of cooperation and its failure to allow Aspen to examine its records.  Plaintiff cannot show that it sustained a covered loss due to the May 31, 2013 weather event.  Aspen conducted a thorough, good faith investigation, of Shadid's claim but was precluded from completing a full evaluation of any pre-existing damages vs. any damages sustained on May 31, 2013 in order to verify the existence or extent of a covered loss due to Shadid's own breach of its contractual duties of cooperation. Shadid, by failing to provide information not available to Aspen from other sources, prohibited Aspen from discharging its duties under the policy, and thus Aspen may not be held liable for bad faith or punitive damages.  There are no facts to establish what could reasonably be perceived as tortious conduct on the part of Aspen.  As such, Plaintiff's claim for bad faith and punitive damages against Aspen must be dismissed as a matter of law.

**IV.    Aspen is Entitled to a Judgment as a Matter of Law that Plaintiff May Not Recover for Property Damages that Existed Prior to the Effective Period of the Aspen Policy**

The Aspen policy issued to Shadid had an effective date of August 20, 2012 and an expiration date of August 20, 2013. (Exh. 2, Aspen Policy PRAAJM212, Common Policy Declarations).  The policy provided coverage for "**loss or damage commencing . . . during the policy period shown in the Declarations . . .**" (Exh. 2, Aspen Policy PRAAJM212, Shadid v. Aspen 1358) (emphasis added).  As stated above, under Oklahoma law, insurance contracts are interpreted "in accordance with principles applicable to all contracts." *Mansur*, 589 F.3d at 1319.  They are "construed according to the plain meaning of its language," and, if unambiguous, the court "interprets the contract as a matter of law." Id.

Any loss or damage occurring prior to August 20, 2012 is clearly not covered under the policy.  However, during the course of the claim Shadid argued that Aspen should be liable for damage that pre-existed the policy period because there is no exclusion in the policy specifically stating that pre-existing damages are not covered.  (Shadid has recently recanted this argument in his recent deposition stating that he is now only seeking recovery for damages associated with the May 31, 2013 event.  However, Aspen seeks summary judgment on this issue out of an abundance of caution).  However, no such exclusion is necessary.  The plain language of the Common Policy Declarations could not be clearer in stating that only losses or damages **commencing during the policy period** are covered under the policy and no exclusion is needed to re-state or reinforce a clear term contained in the policy itself.  The suggestion that a property owner could experience an uninsured loss and purchase an insurance policy after the loss to pay for the same loss is absurd and

flies in the face of the fundamental framework and purpose of insurance.  **Insurance is to protect against the _risk_ of future loss, not past losses.**  Shadid cannot obtain insurance for prior underinsured losses in the same way that a person cannot obtain insurance tomorrow for a car accident that occurred yesterday.  As the language of the policy is unambiguous, the Court should interpret the contract as a matter of law and issue judgment that Aspen is not liable for any losses or damages that may be found at trial to have been sustained at the Shadid properties outside of the policy period.

V.      **Aspen is Entitled to a Judgment as a Matter of Law that Plaintiff May Not Recover on a Replacement Cost Basis for Damages to Properties Sold by Shadid Prior to the Completion of Repairs Related to the May 31, 2013 Weather Event**

The Aspen policy provided optional Replacement Cost Coverage ("RCV") to the Shadid properties.  However, the policy states that Aspen "will not pay on a replacement cost basis for any loss or damage . . . until the lost or damaged property is actually repaired or replaced . . ." (Exh. 2, Aspen Policy PRAAJM212, Shadid v. Aspen 1348).   Under the policy, Aspen is only required to pay the "actual cash value" of the damaged portion of property where the property is not repaired or replaced.  As stated above, unambiguous terms of insurance policies are to be interpreted as matters of law. _Id._  Replacement cost clauses in property insurance contracts "are enforceable as long as they are clear and unambiguous." _Truesdell v. State Farm Fire & Cas. Co._, 960 F. Supp. 1511, 1516 (N.D. Okla. 1997).

26

Shadid has sold at least two of the properties for which it is seeking damages in this suit.  The "Indiana Shops" property at 1708 Indiana Avenue was sold to Plaza 1529, L.L.C. on May 7, 2014.  The "Delwood Shops" property at 3204-3220 Tinker Diagonal Street was sold to Fly By Day, L.L.C. on April 19, 2014.  As Shadid cannot complete repairs or replace damage portions of property it does not own, any recovery must be limited to the actual cash value, not replacement cost, for these properties or for other properties it sells prior to the resolution of this lawsuit.  Therefore, Aspen is entitled to judgment as a matter of law that it is only liable for the actual cash value of that portion of the property the jury may determine to have been damaged as a result of the May 31, 2013 storm for those properties which Shadid has sold.

## CONCLUSION

As set forth in great detail herein, Aspen fulfilled its obligation to investigate Plaintiff's claim in good faith.  However, Aspen was not able to determine the existence or extent of a covered loss due to Shadid's pervasive and ongoing breach of his contractual duty to cooperate in the investigation of its claim and to allow Aspen to examine documents pertinent to its claim.  As such, Aspen is entitled to summary judgment of all claims asserted by Shadid in this lawsuit.  Barring full summary judgment, in the alternative, Aspen is entitled to dismissal of Shadid's bad faith and punitive damage claims because Shadid cannot meet his burden to prove any tortious conduct on the part of Aspen.  Aspen conducted a reasonable investigation under the circumstances created by Shadid's own refusal to cooperate, and had a reasonable basis to deny Shadid's claim.  This is true as a

matter of law.  Aspen is also entitled to judgment as a matter of law that it cannot be held liable for damages which occurred outside of the policy period, and that Shadid may not recover replacement cost benefits for damages sustained at properties which he sold.

Respectfully submitted,

**LOBMAN, CARNAHAN, BATT, ANGELLE & NADER**

                    **/s James P. Nader**
BY:_____
     **JAMES P. NADER, OBA #32156**
     400 Poydras St., Suite 2300
     New Orleans, LA 70130
     Telephone: (504) 586-9292
     Facsimile: (504) 586-1290
     jpn@lcba-law.com

     **and**

     **ANDREA R. RUST, OBA #30422**
     **MILLER DOLLARHIDE**
     210 Park Avenue, Suite 2550
     Oklahoma City, OK 73102
     Telephone: (405) 236-8541
     Facsimile: (405) 235-8130
     arust@millerdollarhide.com

     *Attorneys for Aspen Specialty Insurance Company*

28

## Certificate of Service

I hereby certify that on July 8, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Kenneth G. Cole – kgcole@coxinet.net
Mark A. Engel – Mansell-engel@coxinet.net
Steven S. Mansell – Mansell-engel@coxinet.net

*Attorneys for Plaintiff*

/s James P. Nader

29