IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

CHARLES A. SHADID, L.L.C. an        *
Oklahoma Limited Liability Company, *
        Plaintiff                *
                            *
VERSUS                              *     CASE NO.: 5:15-cv-595-D
                            *
ASPEN SPECIALTY INSURANCE           *
COMPANY, a Foreign Corporation      *
                            *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>AFFIDAVIT</u>

**STATE OF MASSACHUSETTS**

**COUNTY OF SUFFOLK**

BEFORE ME, the undersigned Notary Public, duly commissioned within and for the State and County aforesaid, personally came and appeared:

**ANTHONY ANNIELLO**

who, being by me first duly sworn, deposed and state:

1. I am Vice President of Property Claims at Aspen Specialty Insurance Company and held this position at all times pertinent to Claim Number PR1200037375, asserted by Charles A. Shadid, Charles A. Shadid, LLC, and Charles A. Shadid



Revocable Trust (sometimes collectively referred to as "Shadid") arising from a weather event on May 31, 2013 which allegedly damaged properties owned by Shadid.

2. I have personal knowledge of the facts and circumstances of the claim and I am competent to make the statements set forth in this Affidavit. My knowledge is based on my involvement with the claim and through my review of the non-privileged portions of Aspen Specialty Insurance Company's file and other documents, sworn copies of which are attached to this Affidavit.

3. Policy Number PRAAJM212 was issued to Charles A. Shadid, Charles A. Shadid, LLC, and Charles A. Shadid Revocable Trust and provided property coverage to 25 properties in the Oklahoma City area on May 31, 2013. (Exh. 2, Aspen Policy PRAAJM212).

4. About two and a half months after the storm in question, a Property Loss Notice was provided to Aspen by Shadid on or about August 16, 2013, alleging one property, Lakeshore Shopping Center, was damaged by hail on May 31, 2013. (Exh. 3, 8/15/13 Property Loss Notice).

5. Aspen promptly assigned the claim to Associated Claims Management, Inc., ("ACM") on August 16, 2013, to act as Aspen's field adjuster for the claim. (Exh. 4, Acknowledgement of Assignment).

6. On or about August 26, 2013, Shadid's insurance agent notified Ken Smith of ACM that Shadid wanted to expand the scope of the insurance claim because he believed properties other than the one Lakeshore Shopping Center property had sustained damage. (Exh. 5, 8/26/13 ACM Time Log Entry).

7. On or about August 27, 2013, Smith contacted Shadid to notify Shadid that ACM would schedule inspections and also would be sending a letter to Shadid requesting information about Shadid's prior claims, repairs, and maintenance history on the properties that are part of the current claim. (Exh. 6, Ken Smith emails to Jonna Holm).

8. On or about August 30, 2013, Smith was notified that Jerry Renfroe had been hired as a public adjuster (P.A.) by Shadid to handle his claims, and Smith and Renfroe discussed coordinating the inspection of the properties. (Exh. 7, ACM 8/30/13 Time Log Entry).

9. In order to assist a full and complete inspection of the properties, on or about September 5, 2013, Smith sent a letter to Shadid and Renfroe requesting

- 3 -

information and documentation from Shadid regarding the alleged loss and prior condition of the properties, including 1) specific repairs made due to the May 31, 2013 loss along with corresponding estimates, 2) approximate dates of the acquisition of the properties, 3) major exterior repairs during the previous ten years, 4) the identification of and documents associated with prior claims for damage, and 5) a list of all insurance policies that had provided property coverage in the previous ten years.  The letter also referenced the applicable policy language regarding the insured's duties of cooperation in the event of a loss. (Exh. 8, 9/4/13 ACM Letter to Shadid).

10. On or about September 5, 2013, ACM and Shadid's P.A., Renfroe, agreed to dates for the property inspections. (Exh. 9, ACM 9/5/13 Time Log Entry).

11. On or about September 19, 2013, ACM again requested that Renfroe cooperate and provide documents regarding prior building repairs and insurance claims regarding the Shadid properties. (Exh. 10, ACM 9/19/13 Time Log Entry).

12. In an effort to understand the claims, ACM inspected the Shadid properties September 23 through September 26, 2013 even though Mr. Shadid had not provided the requested information on the properties.  During these inspections, ACM saw hail damage that appeared to be old and to preexist the alleged date of the claim, and therefore required further investigation and inspections by the

appropriate experts including engineers. The previously-requested documents regarding prior damage and repairs to the properties were essential for ACM to determine which damages pre-dated the May 31, 2013 storm and to accurately determine the scope and value of Shadid's losses related to the May 31, 2013 storm. (Exh. 11, Aspen 10/3/13 Log Entry).

13. Shadid indicated to ACM at this time that he was an attorney and had not settled any insurance claims in the past without filing a lawsuit. ACM then found a lawsuit filed by Shadid for the same properties involved in this claim related to a 2010 hailstorm, which ACM believed, at the time, had been settled for at least $3,000,000. It was subsequently discovered that Plaintiff had received significantly more than that amount in settlement, although the exact amount is currently unknown. (Exh. 11, Aspen 10/3/13 Log Entry; Exh. 12, 10/23/13 ACM email to Aspen).

14. Shadid claimed all existing damages to the properties were due to the May 31, 2013 date of loss. However, the September 23 through September 26, 2013 inspections revealed that much of the damage was old and existed prior to May 31, 2013. Shadid had still refused to turn over information about his properties and Aspen had legitimate questions based on its adjuster's visual observations about what damage, if any, may have been caused by a May 31, 2013 storm as alleged

by Shadid or whether all of the observed conditions pre-dated the May 31, 2013 weather event. (Exh. 11, Aspen 10/3/13 Log Entry).

15. The inspections also showed that possibly some of the roofs had been only partially replaced after a prior storm, that some roofs appeared to pre-date the 2010 hailstorm, and that hail impacts to rooftop components and equipment were old damage.   Without the repair records ACM had requested on multiple occasions, ACM was unable to clearly determine which repairs for which Shadid had been paid from the 2010 hailstorm were actually undertaken. (Exh. 13, 11/13/13 ACM Loss Status Report).

16. Despite Mr. Shadid's continued refusal to provide Aspen with information about the properties' pre-storm condition, ACM's attempt to get information revealed over 50 storms in the previous 10 years with hail of one inch or larger. (Id.).

17. Shadid provided his first response to ACM's request for information and documents four months after the date of the storm on or about October 7, 2013. However, Shadid provided only very limited information regarding (1) repairs associated with the alleged May 31, 2013 loss, and (2) the dates the properties were acquired by Charles A. Shadid, LLC.   Shadid still refused to provide estimates for repairs related to the alleged loss, dates the properties were first acquired by Shadid or any of his related entities who acquired the properties prior

to their ownership being transferred to Charles A. Shadid, LLC, information regarding major exterior repairs from earlier years, information regarding prior damage property claims, or a list of prior insurance policies from the previous ten years. (Exh. 14, ACM 10/7/13 Time Log Entry; Exh. 15, Shadid Letter dated 9/23/13).

18. On October 10, 2013, despite the evidence of prior building damage which had not been repaired, Shadid submitted a repair estimate to Aspen for the full replacement of all roofs, rooftop components, air condition units, and other structural components on all buildings included in the claim. (Exh. 16, 10/10/13 Shadid letter to Aspen; Exh. 17, Just Property Restoration Estimate.)

19. On or about November 4, 2013, ACM sent another letter to Shadid requesting more specific descriptions of the repair work which was allegedly completed due to the storm of May 31, 2013. ACM reiterated its prior requests for information regarding repairs to the properties occurring in the 10 years prior to this loss and for Shadid to identify and provide information and documentation regarding prior claims related to these same properties. (Exh. 18, 11/4/13 ACM letter to Shadid).

20. The November 4, 2013 letter also notified Shadid of potential coverage issues with the claim that would need to be resolved and reserved Aspen's rights under the policy. These issues included the potentially applicability of policy exclusions for

wear, tear, and decay of the property; prior inadequate repairs and maintenance of the properties; and the lack of coverage for damage where no opening was created in the structure. (Id.).

21. The November 4, 2013 letter further notified Shadid that the Aspen policy only provided coverage for damages occurring during the policy period and that ACM's inspection had revealed damage that may have occurred over a period of years prior to the issuance of the Aspen policy. ACM communicated to Shadid that the requested information would be needed to define a reasonable value for a settlement of the claim or to determine whether a covered loss occurred. ACM also informed Shadid that Aspen wanted to speak with him directly to help Aspen understand this claim and take his Examination Under Oath. (Id.).

22. On or about November 22, 2013, Aspen's counsel sent a letter to Shadid, again stating that only damage occurring during the policy period was covered under the Aspen policy, advising Shadid of Aspen's intent to have an engineer inspect the properties upon receipt of the requested documentation, reasserting again Aspen's prior requests for documents and information, and requesting an Examination Under Oath of Mr. Shadid. (Exh. 19, 11/22/13 Aspen Letter to Shadid).

23. On or about December 8, 2013, Aspen's counsel sent a letter to Shadid confirming the scheduling of an Examination Under Oath to occur on January 16, 2014, and

again restating the need for Shadid to provide the requested information regarding the condition of the properties prior to the date of loss, including documents and information regarding prior claims and repairs, so that Aspen could fully investigate Shadid's claim. (Exh. 20, 12/8/13 Aspen Letter to Shadid).

24. Shadid responded to Aspen's counsel's letter on or about December 13, 2013, stating Shadid intended to provide information to which he believed Aspen was entitled.   However, Shadid continued to refuse to provide any information regarding prior repairs to the properties or any information regarding prior damage claims to the properties involved in the current claim. (Exh. 21, 12/13/13 Shadid Letter to Aspen).

25. The Examination Under Oath of Charles Shadid occurred on January 16, 2014. Shadid stated he had filed significant losses on the properties over the previous seven years, including at least one ongoing lawsuit associated with a 2010 hail claim, in which he inaccurately indicated he was seeking damages of approximately $2,000.000.00. (Exh. 22, Shadid EUO, pp. 15-17, 106-107).

26. Aspen's counsel sent another letter to Shadid's counsel on or about February 7, 2014, now eight months after the storm in question, requesting documents which were discussed by Shadid at his EUO and which had been previously requested by ACM and Aspen's counsel on multiple occasions.  These documents included: 1)

repair estimates, invoices, and public adjuster reports regarding Shadid's 2010 claim against Covington Insurance Company, 2) documents Shadid produced in support of its claims in litigation regarding the 2010 loss, 3) photographs of the properties taken after the 2010 loss but prior to related repairs, 4) photographs taken after repairs related to the 2010 loss, and 5) documents regarding major exterior repairs undertaken in the 10 years prior to the May 31, 2013 loss. (Exh. 23, 2/7/14 Aspen Letter to Shadid).

27. After the EUO, Aspen learned that Shadid had made another claim related to an alleged May 2012 loss for some or all of the same properties involved in the current claim.

28. Shadid's counsel sent a disc to Aspen's counsel on or about March 20, 2014 which generally included documents regarding information that had already been provided to Aspen as to repairs performed after May 31, 2013, and did not include any information regarding prior damage claims, including the 2010 or 2012 claims that were essential to Aspen's understanding of the pending Shadid claim. (Exh. 24, 3/20/14 Shadid Letter to Aspen).

29. On or about April 11, 2014, ACM sent a letter to Shadid again asking for the previously requested documents and explicitly stating that Aspen "needs to know what was damaged, what was paid for, and what was actually repaired from the

2010 and 2012 storms." The letter restated that the Aspen policy only provided coverage for damages occurring during the policy period and requested that the documentation be provided prior to inspections by Aspen's engineers scheduled to begin on May 5, 2014 so the engineers would have a better understanding of the condition of the roofs before and after the storm in question. (Exh. 25, 4/11/14 ACM Letter to Shadid).

30. Shadid responded to Aspen's April 11, 2014 letter on or about April 21, 2014, referencing documents that he had previously provided showing post-storm repairs. However, Shadid did not address his willful refusal to provide documents related to the pre-loss condition of the properties and prior claims which were critical to Aspen's adjustment of the pending claim. (Exh. 26, 4/21/14 Shadid Letter to Aspen).

31. In the April 21, 2014 letter, Shadid for the first time, and now almost a full year after the storm, disingenuously claimed that the settlement agreement with Covington Insurance for his 2010 claim prevented Shadid from disclosing "documents and information" about the 2010 loss. However, the portion of the settlement agreement cited by Shadid (who is an attorney) clearly only prohibited the release of the amount of the settlement, not the underlying documents or information. He also claimed that documents related to the 2010 loss were not relevant because most of the roofs had been replaced in recent years. However,

even though he was the only possible source of the information, no information was ever provided to Aspen to show which roofs were or were not replaced or the date of the alleged replacements. Further, Shadid's claim in 2013, just like in 2010, involved significant items of property damage, other than the roofs, including replacement of HVAC units, roof decking, and siding. (Id.)

32. In a further effort to evaluate the claim, and despite Shadid's refusal to provide the essential information repeatedly requested, Aspen's retained engineers inspected the Shadid properties between May 5, 2014 and May 14, 2014. (Exh. 27, ACM 5/5/14 – 5/14/14 Time Log Entries).

33. ACM responded to Shadid's letter of April 21, 2014 on or about May 20, 2014.  In that letter, Aspen again requested documents regarding the roof repairs, and documents regarding Shadid's 2010 and 2012 wind and hail claims. Aspen brought to Shadid's attention the fact that the documents requested by Aspen were not covered by the Shadid's confidentiality agreement with Covington Insurance, which only applied to the amount of the settlement. Aspen again advised Shadid that the requested documents were relevant and essential to an accurate assessment of Shadid's May 31, 2013 claim. Lastly, the letter again warned Shadid that his refusal to provide this necessary information amounted to a clear violation of Shadid's post-loss obligations as contained within the Aspen policy to cooperate

and assist Aspen in its investigation of the claim. (Exh. 28, 5/20/14 ACM Letter to Shadid).

34. Information regarding the extent of damage to the properties associated with the 2010 and 2012 property damage claims and repairs to the properties associated with these storms was necessary to fully evaluate the extent of pre-existing damages in order to determine if the properties had sustained any damage as a result of the alleged May 31, 2013 event.   This information was important in part due to a significant hail event which had occurred in 2012 and for which Aspen knew Shadid had made a claim.   Shadid refused to provide Aspen with any detailed information as to the properties involved in the 2012 claim or to what extent any of his properties had been damaged as a result of the 2012 weather event.

35. ACM received a letter from Shadid on or about June 9, 2014, containing an additional 148 pages of documents. These documents were again largely duplicative of prior submissions received from Shadid evidencing repairs to the properties after May 31, 2013. Shadid still had not produced any documents regarding prior repairs and claims and Shadid still refused to produce such documents.   (Exh. 29, ACM 6/9/14 Time Log Entry; Exh. 30, Shadid Letter to ACM dated 6/2/14).

36. ACM sent a letter to Shadid on June 30, 2014, now over one year from the storm in question, yet again restating its request for documentation regarding prior claims and repairs. ACM informed Shadid that Shadid's failure to provide this information had frustrated Aspen's efforts to investigate the claim and had caused significant delay. ACM noted that Aspen had an incomplete picture of the loss and was unable to confirm whether any disputed damages were owed due to Shadid's refusal to cooperate in the claim investigation as required under the contract/policy of insurance. (Exh. 31, 6/30/14 ACM Letter to Shadid).

37. On July 8, 2014, Shadid's insurance agent provided Aspen with a spreadsheet listing of roof repairs allegedly completed by Shadid. However, the list only indicated the dates when repairs were completed and included no documentation (e.g. invoices, photographs, payments) about the reason for or extent of repair work actually performed. (Exh. 32, List of Roof Repair Dates from Shadid's Insurance Agent).

38. Despite Mr. Shadid's refusal to cooperate, Aspen's retained engineers independently compiled some limited information on the properties such as aerial photographs of the roofs in a further effort to evaluate this claim. Based on this information, the engineers were not able to relate any damage to the roofing membranes due to the May 31, 2013 hailstorm. They also noted, based on weather data, the most significant prior hail event at the Shadid properties

occurred on May 29, 2012, when hail of 1.5 to 2.4 inches may have fallen. (Exh. 33, 12/22/14 ACM Loss Status Report).

39. Aspen's policy was not in effect on May 29, 2012. (Exh. 1, Aspen Policy PRAAJM212).

40. Given this information and Mr. Shadid's refusal to cooperate, Aspen had good faith questions as to whether the same damages sought as a result of the May 31, 2013 weather event had been claimed by Shadid in 2010 or 2012 and had not been repaired as of May 31, 2013.

41. After Mr. Shadid's continued refusal to cooperate and provide Aspen with documents and information related to this claim, Aspen denied the claim on or about February 18, 2015, due to Mr. Shadid's breach of his duty to cooperate or prove a covered claim under the insurance policy. (Exh. 34, 2/18/15 Aspen Letter to Shadid).

ANTHONY ANNIELLO

SWORN AND SUBSCRIBED
BEFORE ME, THIS 8 DAY
OF JULY , 2016.

NOTARY PUBLIC

Ann McEntee
MY COMMISSION EXPIRES
JULY 15, 2022
NOTARY PUBLIC
COMMONWEALTH OF
MASSACHUSETTS

- 15 -